**UNITED STATES of America,
Plaintiff-Respondent,**

**v.**

**James Vincent KEOGH, Defendant-
Petitioner.**

**No. 61 Cr. 1113.**

United States District Court
S. D. New York.

Sept. 5, 1968.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, New York City, for the United States; J. Frank Cunningham, Ronald L. Gainer, Attys., Dept. of Justice, Washington, D. C., of counsel.

Philip Handelman, New York City, for defendant-petitioner; Robert M.

Trien, Arthur H. Sobel, New York City, of counsel.

## OPINION

WEINFELD, District Judge.

The Court of Appeals remanded this matter for an evidentiary hearing limited to the single issue of the four bank deposits in February, 1961, which the FBI report of November 28, 1961 states could not be identified as to source.[1] This Court was also called upon to "determine whether the Government's failure to turn over the report was sufficiently serious in its motivations or consequences to warrant the extraordinary relief of *coram nobis*." [2]

The mandated hearing has been held. It extended over seven days, during which nineteen witnesses testified, a transcript of more than one thousand pages was compiled, and scores of exhibits were received in evidence. With the record now before it, the Court finds that each of the four deposits derived from an innocent source, and that the Government's attorneys were without motivation in failing to turn over the report to the defense.

## I. THE DEPOSITS

The testimony, buttressed by incontrovertible documentary proof, establishes that the funds deposited on each of the four occasions could not have been the proceeds of the bribe money.

Three of the four items were deposited in Erdman's account at the Chemical Bank New York Trust Company, as follows:

| Date Deposited | Amount |
| --- | --- |
| Feb. 8, 1961 | $1,500.00 |
| Feb. 10, 1961 | 5,539.94 |
| Feb. 17, 1961 | 7,500.00 |

*The deposit of February 8.* The Chemical account was opened with a $1500 check deposit on February 8, 1961. Morris J. Schutz and Erdman testified as to this item. Schutz, an attorney, had represented without charge an old friend in a personal injury action.[3] Erdman was the treating physician. Upon settlement of the case Schutz paid Erdman $1500 for his services by check, as authorized by his client, and thereafter received Erdman's bill for the charge. On January 31, 1961, in remitting the net proceeds to his client, Schutz referred to the payments for medical services. Schutz no longer has the original check;[4] however, the available records of the Chemical Bank substantiate the opening of Erdman's account there on February 8 by the initial deposit of Schutz's $1500 check.

*The deposit of February 10.* Testimony as to the source of this deposit was given by witnesses from Puerto Rico—Cesar Gonzalez and an attorney,

1. United States v. Keogh, 391 F.2d 138 (2d Cir. 1968), aff'g in part, remanding in part 271 F.Supp. 1002 (S.D.N.Y.1967).

2. 391 F.2d at 149.

3. Petitioner's counsel's criticism of attorney Schutz for failure to file a statement under Rule 4 of the Special Rules Regulating Conduct of Attorneys, Appellate Division, 1st Dept. (1961), is as unfair as it is unwarranted. Since an attorney's conduct is impugned, the Court deems it proper to refer to petitioner's Exhibit 23 id. and respondent's Exhibit L id., as to which Schutz testified. Respondent's Exhibit L id., the letter of January 31, 1961, which remits the settlement proceeds to the client, states: "As I explained to you when you asked me to handle the case, I shall make no charges for my services in your behalf. I told you that I would do everything possible because of our friendship over many years and I wish the settlement could have been more * * *." Nonetheless, the grateful client forwarded a check for $2500, which Schutz promptly returned, "in deference to [their] friendship * * *." Pet.Ex. 23 id. The Rule applies only in contingent fee cases.

4. When Schutz testified at the hearing on July 29, 1968, he no longer had his bank and check records for the years 1961, 1962 and 1963. The Chemical Bank, too, no longer had all its records of the transaction. SMH 629. ("SM" refers to the stenographers' minutes of the trial; "SMH," of the hearing.)

Harry Woods—and by Erdman. Erdman and others, including Woods, owned stock in a land-holding company in Puerto Rico. Gonzalez purchased all of these shares. The total purchase price of each interest was $6,539.94, of which $1,000 was paid on January 27, 1961. The balance of $5,539.94 was paid on February 7, 1961. Gonzales purchased from the Banco de Ponce in San Juan, Puerto Rico, two cashier's checks, one for $3,000 and the other for $2,497.88. The receipts for the bank checks were produced by Gonzales. The two bank checks, together with Gonzales's personal check for $42.06, totalling $5,539.94,[5] were delivered to attorney Woods, who forwarded the three checks to Erdman; on February 10, 1961, they were deposited in Erdman's account in the Chemical Bank.

*The deposit of February 17.* This is a check deposit of $7500. The check is that of Ruth Wexler, Dr. Erdman's mother-in-law. Explanation is required of this item, but in end result this deposit, too, is beyond challenge.

In the late 1950's the Erdmans were engaged in the construction of a substantial residence in Kings Point, Long Island, and had advanced to their contractor before its completion some $30,-000. The contractor defaulted; the Erdmans engaged sub-contractors to complete the job and for this purpose from time to time borrowed monies from Mrs. Erdman's mother, Ruth Wexler. Repayments were made when convenient. Late in 1960 the Erdmans contracted to sell the Kings Point residence and moved to an apartment in the Riverdale section of New York City. Almost immediately, they were in the market for a house near the well-known Riverdale schools, but for one reason or another lost several opportunities to purchase.

On February 16, 1961, approximately $11,000 was owed to Mrs. Wexler. On that day, Mrs. Erdman gave her mother a check for $7500 on account of the loans. The check was drawn against her account at the Meadow Brook National Bank, Great Neck, Long Island, which she still maintained there although then living in Riverdale. Almost immediately an unexpected opportunity presented itself to purchase the much-sought-for home. The broker suggested that a binder in a larger amount than usual would clinch the matter. Thereupon, Mrs. Erdman asked her mother either to return or destroy the check, but Mrs. Wexler had already deposited it in her account. Accordingly, Mrs. Wexler issued her own check to the order of Dr. Erdman in the sum of $7500.[6] This is the check deposited to his account in the Chemical Bank, the third item in the report.

The focus of inquiry at the hearing shifted to the source of the funds in Mrs. Erdman's account at the Meadow Brook National Bank, against which she had drawn the check given to her mother. The thrust of this aspect of petitioner's claim was that these funds were part of the bribe money delivered by Moore to Erdman. The Erdmans testified to the contrary. They said that the deposit to Mrs. Erdman's account was derived from the contemporaneous redemption of United States savings bonds originally inherited from her father.[7] Initially, the relevant bank records, including the deposit slips for the month of February when the transaction occurred, could not be located by bank officials. After the Erdmans had given their explanation, a bank official, testifying a second time, swore the bank had no record of any bond redemption by Mrs. Erdman either for February or for the year 1961 although such re-

---

5. The payments to the shareholders had been divided in this manner to simplify the transaction for tax purposes.

6. Although the check is dated February 18, 1961, it was deposited on February 17.

7. The state transfer-tax proceedings indicate that Mrs. Erdman's inheritance in United States government bonds alone exceeded $25,000. Resp.Ex. AI

demption records were maintained for a period of ten years.

Needless to say, since up to this point the sole evidence as to the redemption of the bonds was the Erdmans' uncorroborated word, petitioner's attorney was sure he had struck "pay-dirt" and branded their testimony a "wild story." The Erdmans', however, was not the last word. The search was continued by bank representatives; it yielded results.[8] At a reopened hearing limited solely to the matter of the bond redemptions, the same bank official produced a microfilm photograph of a deposit slip on February 16 showing that in fact Mrs. Erdman's account had been credited with $7500 as part of the proceeds of a United States savings bond redemption totalling $7,754.18.[9] The deposit slip on its face is marked "Bond Redemption." Even more compelling evidence as to the source of this deposit was produced when the Government finally located and introduced photostats of the very bonds, fifteen in all, that had been redeemed at the Meadow Brook Bank, each in Mrs. Erdman's name and each bearing on its face a bank employee's pencilled notation of its value. The redemption value pencilled on the bonds totals $7,754.18, the sum entered on the bank deposit slip.[10]

8. The problem inherent in the presentation of evidence seven years after events is highlighted by this incident, as well as by the fact that other banks likewise no longer had certain records. The Erdmans testified that it was their present best recollection that the source of the funds upon which Mrs. Erdman drew her check was bond redemptions. One is appalled to contemplate the consequences had the Meadow Brook Bank records which irrefutably corroborate the Erdmans' recollection not finally been found.

9. The balance of $254.18 was paid Mrs. Erdman in cash.

10. Petitioner's counsel repeatedly sought to broaden the scope of the hearing and to transform it into a roving investigation. After final testimony had been received on the redemption of the bonds in connection with the February 17 deposit and the hearing closed, except, at petitioner's request, for the testimony of Mrs. Wexler, an entirely new tack was pursued. Petitioner's counsel sought to continue the hearing to obtain evidence of bond purchases by Mrs. Erdman, a subject not mentioned in the FBI report of November, 1961, and having no relationship to the four deposits in February, 1961. While awaiting Mrs. Wexler's appearance, the Court telephonically obtained information as to bond purchases and made such information available to counsel. The Court, however, ruled that purchases of Government bonds by Mrs. Erdman on June 28, 1961, had no relevance to the four February, 1961, deposits or their source, excluded the matter as beyond the scope of the Court of Appeals mandate and, with the taking of Mrs. Wexler's testimony, ordered the hearing closed. See the Court's statement, SMH 1009–14. In view of the Court's ruling, the Government adduced no proof concerning the purchases, and the record is devoid of anything on it save the Court's statement based on the telephonic advice. In complete disregard of the exclusion of this matter, petitioner, in his post-hearing memoranda, indulges in a number of speculations based thereon, which in turn are based upon false assumptions. Thus, it is asserted that only after questioning the Erdmans at this hearing on the November 28, 1961, report did petitioner discover that Mrs. Erdman had a bank account at the Meadow Brook National Bank and a safe deposit box there, which led him to information that she purchased Government bonds in June, 1961, charging, without the slightest evidentiary support, that the purchase price might have come from the bribe monies— in sum, petitioner contends that if at the trial he had had the November 28, 1961, report he then would have unearthed Mrs. Erdman's Meadow Brook account, her safe deposit box and her bond purchases in June, 1961. Petitioner's contention rests upon his reiterated assertions of "Mrs. Erdman's concealment of a bank account," or the "heretofore undisclosed bank account of Mrs. Erdman * * *." These assertions repeat petitioner's counsel's statement during the hearing that "prior to the investigation by us * * * with respect to this report of November 28th, no one knew of the Meadow Brook account * * *. [T]here was never any, any report anywhere, or any evidence anywhere, of this Meadow Brook account * * *." SMH 896, 897. The Court cannot permit these statements to go unchallenged. The fact

On June 26, 1961, Mrs. Wexler was repaid $11,376 by a check drawn on the Erdmans' Chase Manhattan account, upon the face of which appears "Repayment of Loan." The check was drawn against the proceeds of the sale of the Kings Point home.

*The deposit of February 6.* This is a $1,000 deposit in the Chase Manhattan Bank. Erdman's best recollection is that it was a transfer from another account.[11] While not buttressed by the same type of irrefutable contemporary documentation which explains the other deposits, other documentary evidence demonstrates that the item could be of no avail to petitioner. The first installment of bribe money, $5,000, was received by Moore from England and deposited in the Moore Overseas Corporation account on February 3.[12] The money was withdrawn on February 7.[13] Accordingly, whatever its source, the deposit of $1,000 on February 6 in Erdman's account could not have been the bribe money.

With the four deposits free from taint and explainable, this Court's considered judgment is that even had the report been available to petitioner before or during the trial, it would have been of no value either in aid of an additional attack upon Erdman's credibility or for any purpose in furtherance of petitioner's defense. Indeed, it could not have been used even to "engage in the forensic endeavors" outlined in the Court of Appeals opinion. Its value to the defense would have been no greater than the proverbial grain of sand upon the ocean front. When the Court of Appeals ordered this hearing, it observed: "[I]t is possible that further work on Erdman's and the banks' records might indicate an innocent source of the deposits and thereby put the entire controversy to rest."[14] In sum, it does and it should.[15]

---

is otherwise; upon the trial Dr. Erdman testified that Mrs. Erdman had an account at the Meadow Brook Bank. SM 755.

Equally fallacious is the statement in petitioner's Post Hearing Reply Memorandum that Erdman's account at the Security National Bank had not been revealed at the trial (with its gratuitous criticism of Singer for his "appalling lack of information concerning Erdman's finances," id. at 8). Upon this misstatement petitioner attempts to revive the charge, previously made and rejected, that Government counsel upon the trial misrepresented Erdman as a wealthy man. Again, the fact is otherwise. Singer, petitioner's trial counsel, not only knew of the Security National Bank account; he had subpoenaed all of Erdman's bank records, including those from the Security National Bank (SM 1018; 3245–46; SMH 230); in addition he acknowledged he had received from Hundley cancelled vouchers of "Erdman's personal accounts in the Chase, Chemical and *Security National* banks." SM 3246 (emphasis supplied). And while the matter of Erdman's wealth is beyond the frame of reference on this remand, the misstatement of petitioner's knowledge of the Security account and others of like tenor require the observation that the record corroborates Hundley's testimony at this hearing that he believed at the time of trial and still believes that Erdman was

a man of wealth. A financial statement filed with the Chemical Bank on February 24, 1961, reflects assets, principally real estate, totalling $581,500 and liabilities of $221,000. Pet.Ex. 4, at 56–57. Erdman's income for 1961 was at the annual rate of $200,000. United States v. Keogh, 271 F.Supp. 1002, 1012 (S.D.N.Y. 1967). In the four preceding years it was approximately $150,000 each year. Pet.Ex. 4, at 60. That there were loans and overdrafts or that his banking habits were not tidy did not diminish his net worth or his income. Parenthetically, it is noted that the Security National Bank had authorized acceptance of overdrafts on Erdman's account in the amount of $5000. Pet.Ex. 4, at 53.

11. Hundley's recollection of what Erdman told him at trial is consistent with Erdman's present recollection. The accountant, who, long after the event, had the task of completing Erdman's books, could not locate the transferor account, but his audit did not include all of Erdman's accounts.

12. Pet.Ex. 16, 17; Resp.Ex. G, I.

13. Pet.Ex. 17; Resp.Ex. H–1.

14. 391 F.2d at 149.

15. The evidence also puts an end to speculation on the accounts that Mrs. Erdman established at the First Federal Savings and Loan Association in June,

## II. THE MOTIVATION OF THE PROSECUTION

Since the questioned items are innocent in nature, the motivation, if any, of the prosecution in failing to disclose the report to the defense is immaterial under any standard.[16] The matter might well end here. However, notwithstanding the overwhelming evidence of the innocent source of the four items, petitioner presses his charge of prosecutorial misconduct. Since extensive evidence was taken upon the issue of motivation, it is desirable to consider and dispose of the accusation.

Testifying at this hearing were William G. Hundley and John P. Lally of the Department of Justice, who directed the investigation, presented the matter to the grand jury, and prosecuted the case, and Roger Young of the FBI, who directed the financial investigation. The investigation of the allegations of corrupt conduct which resulted in this indictment commenced in May, 1961, and continued to and beyond the final presentation to the grand jury in early December, 1961. In view of the nature of the charges and the prominence of several of those allegedly involved, the investigation was more than routine. The prosecution conducted an intensive check of the statements of those interviewed or called before the grand jury. In many instances, verification was made against documents, cablegrams, and bank and other records. One phase of the inquiry was directed to the sources of the $35,000 bribe monies, the amounts and the dates of their transmittal to Moore, and the times they were available for delivery by Moore to Erdman. Since Moore at all times stated that the bribe monies were in cash, the focus of the financial investigation was on large cash deposits. The inquiry also extended to petitioner's, to Erdman's and to Kahaner's finances in an effort to trace the illicit funds.

Hundley and Lally testified in substance that they were satisfied that the four unidentified items in the FBI report had no relationship to any of the bribe monies, that they were of no significant value to the prosecution or defense, and that they were neither exculpatory nor inculpatory.

The evidence abundantly establishes that this judgment was based upon independent verification of witnesses' statements and of grand jury testimony. While there were the variances as to the amount and the date of the first payment, as the Court of Appeals noted in its opinion,[17] this Court finds that the prosecution, based upon its continuing independent investigation and check of Moore's, of Erdman's and of other witnesses' statements, was convinced that the bribe money was cash and was

1961. The $28,500 that she put into the accounts represented part proceeds from the $56,634 received on the closing of the sale of the Kings Point home; she opened three accounts rather than one in order to keep each account under $10,000, thereby taking full advantage of federal deposit insurance; and she withdrew the funds over the next few months for various purposes, including part payment of the purchase price of the new home in Riverdale.

16. The Court of Appeals distinguishes three classes of cases: those involving deliberate suppression of material obviously highly valuable to the defense, 391 F.2d at 146–147; those involving deliberate suppression, after request for disclosure, of material evidence, id. at 147; and those involving non-deliberate suppression, where no request for disclosure was made, but where hindsight discloses either that the defense probably could have used the evidence to raise a reasonable doubt in the mind of a conscientious juror, or that it does raise such a doubt in the Court's own mind, id. at 147, 148. Whatever the test, then, the evidence must have been in some measure helpful to the defense. Since the items here were explainable and were not related to the bribe money, they could serve no defense purpose.

17. 391 F.2d at 144–146. The defense, of course, had the reports, the witnesses' statements and grand jury testimony, all of which reflected the conflict, and the matter was vigorously inquired into at the trial and strongly pressed upon the jury. SMH 246.

paid in three installments,[18] one in February, 1961, and the other two in March; that it was firmly persuaded upon documentary evidence that the only money available in February, 1961, to Moore for transmission to Erdman was $5,000 sent to Moore from England and deposited in the Moore Overseas account at the Meadow Brook Bank on February 3, from which it was withdrawn by Moore on February 7; further, that the earliest date it was delivered to Erdman was February 20—more likely February 23, 1961; and that, since each date was subsequent to the last of the four deposits, the prosecution concluded that there was no relationship between the four deposits and the bribe money.[19] So, too, the prosecution was satisfied that the $30,000 balance of the bribe money, the separate sources of which also had been independently verified, came into Moore's possession in March, and that in that month, on two separate occasions, the monies were delivered for payment to the bribe-takers.

The prosecution proceeded to trial on the foregoing view of what the testimony would reveal. The fact is, as the Court of Appeals also noted, that such was the ultimate trial testimony of Moore and Erdman: Moore fixed the first payment as $5,000 not earlier than February 20, and Erdman fixed its delivery as February 23.

Perhaps the strongest proof, as of the time of events now seven years past and not from hindsight, that Hundley and his staff were entirely free from motivation is found in the events surrounding his final recommendation to the Attorney General that Keogh be prosecuted. "Considerable pressures" had been exerted on Keogh's behalf that the charges be dropped—a matter here developed by petitioner himself. The Attorney General was determined that the decision as to Keogh's prosecution be made on the merits and so insisted on a factual report.[20]

On November 22, 1961, Hundley submitted a report to the Attorney General stating that before making his recommendation as to Keogh he wanted to await the final report on the financial investigation of Erdman. Thereafter, and following the receipt of the FBI report of November 28, with its reference to the four unidentified deposits, Hundley recommended that an indictment be sought against Keogh, as well as others. That Hundley was fully persuaded the four items had no relationship to the bribe money is underscored by the fact that in recommending prosecution he did not mention them to the Attorney General, which surely he would have, had he deemed them significant, especially so since the Attorney General himself was to make the final decision. And that such was his considered judgment is further underscored by the fact that his recommendation was made with knowledge of the pressures on behalf of Keogh, of which he had been apprised by the Attorney General.

 The Court finds that there was no conscious or deliberate withholding of the report by members of the prosecution staff, and further that they cannot even be faulted for forgetfulness, much less negligence. Since the report was deemed of no more significance than others containing irrelevant matter normally accumulated during the dredging process of an extended investigation, there was no reason for Hundley or his associates to have remembered it before or during the trial.[21]

18. Pet.Ex. 20, at 4.

19. Bank and other records before the grand jury documented the dates when the bribe money was available for payment to Moore. Resp.Ex. G, H, I, J, K; SMH 340–42, 345, 347–48, 381–82, 384, 386–88.

20. SMH 192–94.

21. Hundley's announced intention at trial to recall Erdman to explain any questioned deposits in the event that petitioner recalled Erdman to testify about his finances indicates nothing to the contrary. Petitioner's counsel was referring to "cash deposits" only, and so was Hundley. Accordingly, the FBI report could have had no bearing on the matter. SM 3255–56; SMH 235–36.

Petitioner was represented by a battery of experienced and resourceful lawyers, who, as the trial record abundantly shows, were ever alert to call upon the Government for documentary or other material. They were fully aware that Erdman's finances, as well as those of petitioner and Kahaner, had been investigated; they were also told by Erdman upon the trial that all his records had "been thoroughly examined"; they also knew he had volunteered "a financial statement or any certified statement or anything like that";[22] yet no request was made for any investigative report of Erdman's finances.[23]

This was not a case where the prosecution held its records close to its vest. On the contrary, the prosecution made statements of witnesses available to petitioner and his co-defendants beyond the requirements of the Jencks Act, and, as Hundley testified, "[D]uring the trial we turned over everything that was ever asked for and some that wasn't." There is every reason to accept, and the Court does, Hundley's statement that had a request been made for the report of Erdman's finances it probably would have been granted.

In sum, the record overwhelmingly establishes and the Court finds a complete absence of motivation on the part of the prosecution with respect to the non-delivery of the November 28, 1961, report. There is not the slightest basis for any charge of prosecutorial misconduct.

At the trial, the jury passed on the credibility of the witnesses, including, of course, that of Erdman, the Government's chief witness, upon whose testimony the structure of the Government's case rested. It found his testimony trustworthy. Here the Court is called upon to pass on his credibility, his wife's, and that of members of the prosecution staff. The Court is fully persuaded that each, as well as other Government witnesses, in substance testified truthfully as to their version of events. Seven years after occurrences their recollection as to some events was not always precise, but the substance of their testimony was convincing; each was a forthright witness.[24]

■ Against the background of the living trial[25] as it unfolded from day to day,[26] the grueling four-day cross-examination of Erdman, the totality of the trial evidence, and the record of this hearing, this Court is satisfied to a moral certainty that the undisclosed report would not have permitted the defendant so to present his case that he would probably have raised a reasonable doubt as to his guilt in the mind of a conscientious juror, and further, it would not have raised, and does not raise, such a doubt in this Court's mind.

---

22. SM 1018, 1128.

23. One member of petitioner's trial staff concentrated on Erdman's bank records. SMH 230–33; SM 3246.

24. Their credibility is not impaired by the difference between Erdman and the prosecution staff as to whether Erdman explained the four items to them. Erdman testified that he did, and that he gave them supporting documentary evidence for copying, including Mrs. Wexler's $7500 check. The Government's discovery of a photocopy of the check in its files shortly before this hearing lends substance to his testimony. Young, Hundley and Lally, however, say either that Erdman did not identify the sources of the deposits for them, or that they do not recall his doing so. There appears to be an honest difference of recollection between them on this point. In any event, it is peripheral to the basic issues. On the issue whether the investigators deemed the four items of any consequence by the time of the grand jury presentation, Erdman repeatedly corroborated their testimony that they regarded the deposits as of no significance and without importance. SMH 501, 502, 503, 551, 584, 586. On the issue of the source of the deposits, the difference does not affect the finding that in fact the four items derived from innocent sources.

25. Cf. Glasser v. United States, 315 U.S. 60, 88, 62 S.Ct. 457, 86 L.Ed. 680 (1942) (Frankfurter, J., dissenting).

26. Cf. United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

The probability that its disclosure to the defense would have altered the result is zero.

The repeated assertion of petitioner's present counsel that the case was a close one requires this Court again to observe, as it did upon its prior disposition, that the evidence presented against petitioner was overwhelming; that it did not rest solely upon Erdman's word against petitioner's; and that there was corroborative evidence of a substantial and most compelling nature, much of it based upon petitioner's acts and conduct as well as documentation in his handwriting.

The Court concludes, as it did in the prior denial of petitioner's application, that no act, conduct or omission on the part of the prosecution in any respect violated petitioner's constitutional right to a fair trial. He received a fundamentally fair trial. The interest of justice does not require a new trial.

After the hearing on the issue remanded to this Court, the petition is dismissed in its entirety.