UNITED STATES of America, Respondent-Appellee,

v.

James Vincent KEOGH, Petitioner-Appellant.

No. 519, Docket 33004.

United States Court of Appeals Second Circuit.

Argued June 2, 1969.

Decided June 24, 1969.

Philip Handelman, New York City, (Robert M. Trien, New York City, on brief), for petitioner-appellant.

Ronald L. Gainer, Atty., Dept. of Justice, Washington, D. C. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York), for respondent-appellee.

Before WATERMAN, FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge:

This is the third time this case has been before us. For reasons that will later appear, we doubt it will be the last.

Six years ago we affirmed the conviction of Justice Keogh of the Supreme Court of New York for Kings County and two co-defendants for a conspiracy to influence, obstruct or impede justice in violation of 18 U.S.C. § 1503. United States v. Kahaner, 2 Cir., 317 F.2d 459, cert. denied, Corallo v. United States, 375 U.S. 835, 836, 84 S.Ct. 62, 11 L.Ed. 2d 65 (1963). After having served eight months of his two-year sentence and completed probation for the remainder, Justice Keogh brought before the District Court for the Southern District of New York a petition for a writ of error *coram nobis*. He charged that in several instances the prosecution had knowingly suppressed exculpatory evidence or used perjured testimony. The district court denied the petition without an evidentiary hearing, 271 F.Supp. 1002 (1967). We sustained that ruling in every respect save one, United States v. Keogh, 2 Cir., 391 F.2d 138 (1968).

In paragraph 5(C) of the petition, Keogh began by reiterating his defense that "Dr. Erdman probably did receive money from Moore, under the pretext that Erdman was using it to bribe certain officials in connection with Moore's pending criminal indictment; I did not ask for nor expect nor receive any part of it. It is (and was) my contention that Erdman kept the bribe money * * *." The paragraph went on to allege "that evidence highly probative of that fact was in the possession of the Government at the time of my trial" and that the prosecution suppressed this. This evidence, which had come to the attention of Keogh's counsel as a result of New York disbarment proceedings, was "an FBI report concerning the finances of Erdman and his wife, which indicated unidentified items in Erdman's bank accounts at or about the time I was to have received the bribe payments." The report, rendered November 28, 1961, recited that all of Erdman's bank deposits of $243,590.58 from January through August 1961 had been examined and fully accounted for, with the exception of four deposits in February detailed in the margin.[1] Believing that these deposits

| Identity of bank | Date Deposited | Amount |
|---|---|---|
| Chemical Bank New York Trust Company | 2– 8–61 | $ 1,500.00 |
| "        "        " | 2–10–61 | 5,539.94 |
| "        "        " | 2–17–61 | 7,500.00 |
| Chase Manhattan Bank | 2– 6–61 | 1,000.00 |
| | | $15,539.94 |

The three Chemical deposits were designated as check deposits.

were sufficiently close in time to possible delivery of the bribe money that suppression of the report, at least if accompanied by a particular state of mind of the prosecutors, might be found to require issuance of the writ, we directed an evidentiary hearing "with respect to paragraph 5C." 391 F.2d at 149.

In doing this we suggested that much might turn on whether Justice Keogh could establish "that Erdman's unexplained check deposits came from a suspicious source" or whether the Government could demonstrate an innocent source "and thereby put the entire controversy to rest." Id. At the hearing before Judge Weinfeld the Government undertook this task. He concluded it had succeeded and dismissed the petition, 289 F.Supp. 265 (1968). Specifically he found, 289 F.Supp. at 266–269, on ample evidence, that:

(1) The Chemical deposit of February 8 was a check from Morris J. Schutz, an attorney, for services rendered by Dr. Erdman in a personal-injury action;

(2) The Chemical deposit of February 10 consisted of two cashier's checks of the Banco de Ponce in San Juan, P. R., and a personal check of one Gonzalez representing a balance due on the latter's purchase of Dr. Erdman's stock in a land-holding company in Puerto Rico;

(3) The Chemical deposit of February 17 [2] was a check from Mrs. Ruth Wexler, Dr. Erdman's mother-in-law, representing a repayment by her of a payment of like amount on account of a loan, which Mrs. Erdman had made by a check on her account at Meadow Brook National Bank out of money derived from the redemption of United States Savings Bonds inherited from her father; [3] and

(4) The deposit of February 6 in the Chase Manhattan Bank was a transfer from another account. [4]

Although petitioner criticizes all these findings except (2), we are satisfied that if the defense, armed with the FBI report of November 28, 1961, had endeavored to prove that any of the four deposits represented the bribe money and the Government had responded as it did at the coram nobis hearing, no reasonable juror would have been led to entertain a reasonable doubt on that score. It is true that a different conclusion might be reached if the Government had handed over the report in the course of the trial, the defense had established the deposits, and, because of a need to avoid undue protraction, the prosecution had had no opportunity to develop the facts as has now been done. But the Supreme Court has cautioned that coram nobis relief should be granted "only under circumstances compelling such action to achieve justice," United States v. Morgan, 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98 L.Ed. 248 (1954); and justice does not demand that a conviction be overturned if suppressed evidence would not have assisted the defendant when all the facts were developed.

Petitioner urges that even if he could not have created a reasonable doubt by showing a likelihood that one or more of the deposits was made from the bribe money, the Government's effort to controvert this would have yielded something that would have enabled him to do that. In the course of explaining the $7500 deposit of February 17, bank officials revealed that Mrs. Erdman had a safe deposit box in the Meadow Brook

2. This had particularly provoked our attention because the amount was exactly half the first installment of the bribe money and came nearest in date to the alleged delivery of the latter. See 391 F.2d at 144.

3. The occasion for the repayment by Mrs. Wexler was that, after she had deposited her daughter's check, the Erdmans located a prospective new home and wished to make a larger deposit as a binder.

4. In respect to this, the only instance in which the explanation rested solely on Erdman's testimony, the judge made a further finding that it could not have represented the bribe money since Moore did not have this in hand until February 7.

National Bank in 1961, a fact allegedly not known to either the prosecution or the defense at the trial; that she purchased $15,000 of United States Savings Bonds on June 28, 1961; and that she closed out the box on June 29. Emphasizing that June 28 was the day when Moore had first given a statement to the FBI that there was a supposed "fix" in connection with his criminal case and that he implicated Erdman the next day, Keogh contends that, armed with knowledge of the facts developed at the instant hearing, his counsel would have urged a new line of defense. This would have been that Dr. Erdman gave his wife the $15,000 in cash, representing the first installment of the bribe money, 391 F.2d at 144, to hold in her safe deposit box; that, to avoid this being traced, he met his current financial needs by causing her to redeem the inherited Savings Bonds "and put money into circulation through the indirect route of his mother-in-law"; and that, becoming frightened at Moore's disclosures, Erdman had his wife remove the money, close the vault, and purchase new Savings Bonds. Petitioner complains that the court declined a request, made late in the hearing, for a subpoena requiring the United States Treasury to disclose the full facts concerning the June 28 bond purchases and for the recall of Dr. and Mrs. Erdman. The court justified these rulings on the basis that to grant the requests "would enlarge the limited scope of the inquiry beyond that directed by the Court of Appeals" and that if counsel believed a separate proceeding with respect to the bond purchases was warranted, he was free to pursue that course.

Another point even more strongly pressed upon us does not have even this tenuous relationship to the source of the four deposits. In response to an order for discovery and inspection, the Government turned over to petitioner's counsel an additional FBI report dated February 26, 1962.[5] This concerned an investment of some $50,000 made by Moore, Forman (who, according to the Government, had provided Moore with $25,000 of the bribe money), and Erdman in Ace Manufacturing Company, a Baltimore concern. The Ace investment had figured prominently in the trial. Keogh's counsel argued to the jury that the bribe money was "hidden down in Baltimore" and sought to link this with Erdman's explanation to the trustee in bankruptcy of Moore's company that in later endorsing $50,000 of Moore's restitution notes he had "security" of $35,000, the same figure as Moore's bribe payments. See 317 F.2d at 466, 476–477. The prosecutor was fully aware of the importance attached by the defense to the investment in Ace. He argued in summation:

> Now, Keogh's defense, if I can summarize it, the entire theory of his defense, which was explained to you in great detail by Mr. Singer, is that * * * if the Government had looked down at Ace Manufacturing Company we would have found that $35,000 * * *.

The February 26, 1962, report demonstrated that the Government indeed had done considerable looking. An interview with Becker, Moore's counsel, revealed that Erdman had paid for the bulk of his one-third share in the Ace investment on April 28, 1961, with a check of one Jerome Edelman in the amount of $6000 and his own check for $6917. Erdman's cash disbursement journal showed a check for $6917 on May 3 on his Chemical Bank account and an earlier $3750 payment to Ace on April 14. The contribution of Moore and Forman was in the form of a check for $33,332.66 dated April 28, 1961, on the Meadow Brook National Bank. The account on which it was drawn was opened only on May 2, with a deposit of $100. Nevertheless the check was paid on May 4 and

5. Allegedly this had not been turned over in the New York disbarment proceeding before Hon. Bruce Bromley as it should have been, and for that reason was not dealt with in Keogh's *coram nobis* petition.

the overdraft was met by a cash deposit of $33,350 on May 5. This consisted of $19,700 in $100 bills, $9850 in $50 bills, $1800 in $20 bills, and $2000 in $10 bills. Petitioner links the large cash deposit with Forman's trial testimony that at a meeting around that time in Baltimore, he told Dr. Erdman that he "wanted the money back for Sandy [Moore] that we gave him because he [Erdman] didn't deliver what he was supposed to"; that Erdman agreed to return the money but said he could do no better at that time than give $5000 in cash and a $30,000 note; and that on Forman's expressing dissatisfaction Erdman sought more time and promised to "work it out." Forman went on to testify that on one occasion when he sought the return of the money, Erdman said that "he had given most of the money to the judge and gave some of it to Kahaner" and that he was going to seek further help from the judge. On cross-examination Forman stated that he had regarded Erdman's endorsing the $50,000 notes as the latter's way of making good for having "cheated Moore out of $35,000."

It is strongly contended here that nevertheless the evidence that Forman had $33,350 in small bills on May 5 would have materially strengthened Keogh's claim that Erdman had never given him any of the bribe money.[6] It is argued also that the prosecutor's failure to turn over the February 26, 1962 report casts doubt on the judge's finding that "there was no conscious or deliberate withholding of the [November 28, 1961] report by members of the prosecution staff,

and further that they cannot even be faulted for forgetfulness, much less negligence." 289 F.Supp. at 271. The difficulty is that although the February 26 report was received in evidence, nothing about it was developed at the hearing. Neither Erdman nor the prosecutor was cross-examined on the subject, no attempt was made to call Forman or Moore, and the matter was not briefed to the district court. Counsel for petitioner says any such efforts would have been fruitless in light of Judge Weinfeld's view that the remand was limited to exploration of the four deposits rather than the entire subject of Erdman's retention of the bribe money. While this may constitute sufficient justification for a new petition raising the point, see also fn. 5, as the Government in effect concedes, it would not warrant our directing issuance of the writ when the question has not been explored in depth. Just as the last hearing demonstrated innocent sources for the four deposits, a new hearing may show that the origins of the $33,350 cash deposit were quite different from what Keogh suspects or that the deposit was otherwise irrelevant.

While we could doubtless vacate the order and permit further consideration in this same proceeding of the two points here recounted, we think it better to affirm without prejudice to Justice Keogh's filing a new petition if he so desires.[7] By doing this we indicate our approval of the district court's conclusion with respect to the four deposits. At the same time we leave open for exploration in a new proceeding the issue

6. We note the inconsistency of the Ace claim with that involving Mrs. Erdman's safe deposit box and bond purchases.

7. Along with the February 26 report, the Government delivered to petitioner at the outset of the hearing below an additional FBI report, dated October 17, 1961, which petitioner had not seen before. Petitioner imputes some significance to the fact that this report, which summarizes an accounting investigation of Keogh, Kahaner, and Erdman, reveals that Erdman made cash deposits of $2500 and $2000 in his Chemical Bank account in April and May 1961. The Government responds that these deposits were revealed in documents made available to the defense at trial, and petitioner's reply brief appears to concede this. Again, nothing about this report was developed at the hearing below, and rather than pass on the significance of anything contained in it we leave petitioner free to argue its importance in a new proceeding.

whether evidence developed by the Government in making that demonstration or to which petitioner would have been led by disclosure of the February 26, 1962 report constitutes a sufficient basis for issuance of the writ under the criteria laid down in our last opinion, 391 F.2d at 146–148, and in United States v. Miller, 2 Cir., 411 F.2d 825, 830, 832 (1969). Because of the immateriality of the four deposits we find it unnecessary now to pass upon the findings concerning "The Motivation of the Prosecution," 289 F.Supp. at 270–272; the judge should feel free to reconsider these if evidence developed at any new hearing should so require.

Affirmed.