**UNITED STATES of America,
Plaintiff/Respondent,**

v.

**Michael William HAGA,
Defendant/Petitioner.**

**Crim. No. 81–CR–137.**

United States District Court,
D. Colorado.

July 3, 1990.

Michael J. Norton, U.S. Atty., James P. Moran, Asst. U.S. Atty., Denver, Colo., for plaintiff/respondent.

Walter L. Gerash, Todd J. Thompson, Denver, Colo., for defendant/petitioner.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

THIS MATTER comes before the court on defendant-petitioner's ("petitioner") Motion to Reconsider and Vacate Order re: *Coram Nobis*. Petitioner Michael Haga moves this court to vacate its order of December 14, 1989 denying Mr. Haga's motion for a writ of *coram nobis*, and to assign this matter to the Hon. John L. Kane, Jr. for further proceedings. In the alternative, petitioner moves this court to reconsider its denial of petitioner's motion in the nature of *coram nobis* to vacate judgment of conviction, as per our order dated December 14, 1989. Finally, petitioner requests an evidentiary hearing to resolve the issue of Mr. Haga's competency. We granted the motion for a hearing on the issue of competency. The hearing was held earlier this year.

The court has carefully considered the parties' pleadings, the evidence, and oral arguments. With the following order, we hereby enlarge on our earlier ruling. For the reasons set forth below, petitioner's motion to vacate the December 14, 1989 order and to assign this matter to Judge Kane is DENIED. Further, petitioner's motion to reconsider our previous order denying petitioner a writ of *coram nobis* is DENIED.

## I.

On September 25, 1981, the Hon. John L. Kane, Jr. heard petitioner's guilty plea to one count of Information alleging a violation of 18 U.S.C. § 656. Petitioner admitted to embezzling approximately half a million dollars in funds from a number of area banks. In exchange for the court's accepting petitioner's guilty plea, the government agreed not to file additional charges arising from the defendant's employment at the First National Bank of Bear Valley in Denver. Petitioner was represented by Claud Wild, Esq. at the change of plea hearing.

On October 23, 1981, the court sentenced petitioner. Terry Wiggins, Esq. represented Mr. Haga on that date. At the sentencing, petitioner's attorney represented to the court that petitioner, a law graduate, had worked temporarily as a law clerk with the Wiggins firm while awaiting sentencing. From personal knowledge, Mr. Wiggins alluded to petitioner's remorse for committing the crimes and urged the court to sentence his client to a term of probation. Petitioner was sentenced by the court to a five year term of imprisonment. The court ordered that Mr. Haga should receive psychiatric treatment during incarceration.

Mr. Haga was confined to the penal institution at Fort Worth, Texas. He entered prison on November 3, 1981. While confined, petitioner received treatment for a variety of ailments. His physicians administered prednisone therapy during this time, which reportedly caused a remission in Mr. Haga's symptoms. Mr. Haga was released in December, 1983. Following his release, petitioner remained on parole until November 12, 1986.

On November 7, 1989, petitioner filed a Motion in the Nature of *Coram Nobis* asking the court to vacate its judgment of conviction in this matter. On December 14, 1989, we denied Mr. Haga's petition. Mr. Haga filed a motion to reconsider our order on January 5, 1990, stating that his motion was improperly before this court and ask-

ing us, in the alternative, to reconsider our denial of the writ. The motion further requested a hearing regarding petitioner's competency at the time of his conviction.

At the hearing earlier this year, petitioner, represented by Walter Gerash, Esq., claimed that a recent diagnosis of neurosarcoidosis, an organic neurological disorder, invalidates his guilty plea because he was insane at the time of committing the crime and incompetent when entering his plea. At the hearing on this matter, petitioner offered four medical opinions supporting a diagnosis of neurosarcoidosis, including testimony of Henry Frey, M.D., a Colorado psychiatrist.

Petitioner claims that he continues to suffer adverse legal consequences from his conviction. Beyond the stigma of a felony conviction, he alleged that he may suffer enhanced penalties in further legal proceedings pending in state court,[1] and has already suffered loss of employment opportunities in the banking business, his chosen profession.

## II.

The writ of *coram nobis* was a common law remedy,[2] abolished in civil cases with the passage of amended Fed.R.Civ.P. 60(b) in 1946. Following its abolition in civil cases, the writ's function in modern American law remained unclear for a number of years. The United States Supreme Court, however, in *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), expressly reserved the use of writs of *coram nobis* pursuant to the All Writs Act, 28 U.S.C. § 1651(a), in criminal matters. Courts have disagreed regarding whether the writ is civil or criminal in nature. The

divergence has lead to differing interpretations of *Morgan* in imposing time limits for filing the motion,[3] and in imposing discovery rules on proceedings. Annotation. *Application of Civil or Criminal Procedural Rules in Federal Court Proceeding on Motion in Nature of Writ of Error Coram Nobis,* 53 A.L.R.Fed. 762 (1981).

■ The writ's function in criminal matters is quite narrow; it remains one to fill a void. *Yasui v. United States,* 772 F.2d 1496, 1498 (9th Cir.1985), *cert. denied,* 484 U.S. 831, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987), *reh'g denied,* 484 U.S. 971, 108 S.Ct. 471, 98 L.Ed.2d 409 (1987). Traditionally, the writ was reserved for cases "where no other form of relief is available." *James v. United States,* 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 615 (1982); *Morgan,* 346 U.S. at 512, 74 S.Ct. at 253. That prerequisite has come to mean that writs are issued only after the petitioner has been finally released from custody. "In custody" is defined broadly under 28 U.S.C. § 2255, as probation, parole, or any other form of minimal custodial supervision. *See, Jones v. Cunningham,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); *United States v. Condit,* 621 F.2d 1096, 1098 (10th Cir.1980); *Strand v. United States,* 675 F.Supp. 1283, 1287 (D.Utah 1987), *aff'd,* 865 F.2d 267 (10th Cir.1988).

■ A writ of *coram nobis* is considered an "extraordinary remedy" which is appropriate to correct only fundamental errors and to prevent injustice. *Morgan,* 346 U.S. at 511–12, 74 S.Ct. at 252–53 (writ to be used "only under circumstances compelling such action to achieve justice" and to correct "errors of the most fundamental char-

---

1. At the time of the hearing, plaintiff had a state court proceeding pending in Denver District Court, *People v. Haga,* No. 87CR1890. Trial was scheduled to commence in April, 1990. Defendant, instead of going to trial, entered into a plea bargain. The trial court imposed a deferred judgment pursuant to C.R.S. § 16–7–403. Unless defendant violates the terms of deferred judgment prior to April 8, 1992, his plea will be withdrawn and the case will be dismissed.

2. This writ should be distinguished from a writ of *coram vobis.* The latter is a writ asking for review from the trial court, while the former

asks for review from another arm of the same court.

3. See, *Yasui v. United States,* 772 F.2d 1496 (9th Cir.1985), *reh'g denied,* 484 U.S. 971, 108 S.Ct. 471, 98 L.Ed.2d 409 (1987) (where the 10-day time limit imposed by Fed.R.App.P. 4(b) governed timeliness); *United States v. Mills,* 430 F.2d 526 (8th Cir.1970), *cert. denied,* 400 U.S. 1023, 91 S.Ct. 589, 27 L.Ed.2d 636 (1971) (same rule applied). *But see, United States v. Keogh,* 417 F.2d 885 (2d Cir.1969) (where the 60-day civil rules limit applies).

acter"). *See, e.g., United States v. Scherer*, 673 F.2d 176 (7th Cir.1982), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982) (where petition denied because new evidence of perjured testimony unlikely to have substantially influenced original conviction); *Deaton v. United States*, 480 F.2d 1015 (8th Cir.1973) (where writ denied, but filed on the grounds that guilty plea coerced); *Bruno v. United States*, 474 F.2d 1261 (8th Cir.1972) (where counsel inadequate); *Navarro v. United States*, 449 F.2d 113 (9th Cir.1971) (where writ allowed assertion of self-incrimination defense); *United States v. Mills*, 430 F.2d 526 (8th Cir.1970), *cert. denied*, 400 U.S. 1023, 91 S.Ct. 589, 27 L.Ed.2d 636 (1971) (where petitioner incompetent at time of conviction); *Mitchell v. United States*, 228 F.2d 747 (10th Cir.1955) (where right to counsel violated); *see also, Yasui*, 772 F.2d at 1496; *United States v. Taylor*, 648 F.2d 565, 570 (9th Cir.1981), *cert. denied*, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981) (where prosecutorial improprieties held to be proper basis for writ to issue); *Lewis v. United States*, 314 F.Supp. 851 (D.Alaska 1970); Annotation. *Availability, Under 28 U.S.C.S. § 1651, of Writ of Error Coram Nobis to Vacate Federal Conviction Where Sentence has been Served*, 38 A.L.R.Fed. 617 (1978).

Presumably, the proceedings leading to conviction were correct; the petitioner bears the burden of demonstrating that the asserted error is either jurisdictional or constitutional and results in a miscarriage of justice. *Klein v. United States*, 880 F.2d 250, 253 (10th Cir.1989). Petitioner must demonstrate that he suffers from present adverse consequences sufficient to require the court to adjudge his conviction unconstitutional, and not merely to vacate his sentence. *Yasui*, 772 F.2d at 1498. "[A]bsent a complete miscarriage of justice, and where there have been no serious, fundamental violations of [the petitioner's] constitutional rights, society's interest in finality would not be served by granting [*coram nobis*]." *United States v. Williamson*, 806 F.2d 216, 222 (10th Cir.1986); *Ward v. United States*, 381 F.2d 14 (10th Cir.1967).

The petitioner must also show that valid reasons exist for his not having attacked his conviction earlier. *Maghe v. United States*, 710 F.2d 503 (9th Cir.1983), *cert. denied*, 463 U.S. 1212, 103 S.Ct. 3549, 77 L.Ed.2d 1396 (1983). When, as in this case, the petitioner claims that new evidence exists, he must show that due diligence could not have revealed the evidence prior to trial and that the evidence would likely have lead to a different result. *Klein*, 880 F.2d at 253–54; *United States v. Dellinger*, 657 F.2d 140, 144 n. 9 (7th Cir.1981).

*Yasui*, illustrates the writ's specificity. Mr. Yasui, an American citizen of Japanese ancestry during World War II, was convicted for violating a curfew order, Public Proclamation No. 3 of the Western Defense Command. The proclamation required all persons of Japanese ancestry in certain far western states to be at home between 8:00 p.m. and 6:00 a.m. On November 16, 1942, Mr. Yasui was convicted and sentenced to one year in prison and a $5,000.00 fine. Yasui petitioned the court for a writ of error *coram nobis* on February 1, 1983. He alleged that the government suppressed and manipulated evidence to create a false impression of a serious threat from Japanese Americans. He asked the district court to declare unconstitutional the curfew order, and to vacate his conviction based on consideration of new evidence. The government offered to vacate his conviction and to dismiss the writ of error, but Mr. Yasui opposed the offer and claimed entitlement to a finding that his constitutional rights had been violated. *Id.* at 1498. It is of note that Mr. Yasui later became a well-respected attorney and community leader in Denver. Mr. Yasui died, and his writ was finally denied as moot. Nevertheless, this court follows the approach implicit in the ninth circuit's consideration in *Yasui*—that specific and special circumstances such as those suffered by Mr. Yasui are of the sort for which a writ of *coram nobis* could issue. *See also, Hirabayashi v. United States*, 828 F.2d 591 (9th Cir.1987); *Korematsu v. United States*, 584 F.Supp. 1406 (N.D.Cal.1984).

### III.

Petitioner contends that the same District Judge who accepted his plea of guilty should rule on a *coram nobis* motion. Petitioner cites to numerous authorities to support his proposition. We note that *Gano v. United States*, 705 F.2d 1136 (9th Cir.1983), one of petitioner's authorities, stands for the proposition that the original sentencing judge need not be the judge who sets aside a conviction. Petitioner further cites *United States v. Arnett*, 628 F.2d 1162 (9th Cir.1979), which does not involve a *coram nobis* petition. *Farrow v. United States*, 580 F.2d 1339 (9th Cir.1978) also states that "ordinarily" the original sentencing judge should decide a *coram nobis* petition. Of all the authorities to which petitioner refers, *Carter v. Attorney General of the United States*, 782 F.2d 138 (10th Cir.1986) is the sole persuasive authority in this jurisdiction. In *Carter*, plaintiff sought a writ of error *coram nobis*. The district court originally entered summary judgment in favor of the United States. On appeal, the tenth circuit held that the district court possessed no power to grant relief from a criminal conviction rendered in a different court after full service of the sentence that was imposed.

■ Generally, the petition must be brought in the court in which petitioner was convicted. *Morgan*, 346 U.S. at 507 n. 9, 74 S.Ct. at 250 n. 9; *Carter*, 782 F.2d at 138. And, the original sentencing judge should decide a *coram nobis* motion under ordinary circumstances. The *Carter* court states that motions should be brought "preferably before the sentencing judge who is most familiar with the case ... If the original judge is unavailable, the original court still is preferred to other courts, particularly because potential witnesses usually reside in that jurisdiction." *Id.* (citations omitted); *see also Strand*, 675 F.Supp. at 1287. Our fundamental concern, then, with *coram nobis* matters is that the sentencing court, and not necessarily the original judge, decide the petitions. The *Carter* case clarifies that the sentencing court is the United States District Court of the District of Colorado. *Id.* The reason to prefer the original judge is because of his familiarity with the case.

■ As noted, Judge Kane accepted the plea of guilty of petitioner on September 25, 1981 and sentenced him on October 23, 1981. Judge Kane took medical retirement on April 8, 1988 and returned to the court as Senior Judge on July 18, 1989. Since his return to the bench, Judge Kane has not handled criminal matters in pretrial, trial, or post-trial phases. His judicial responsibilities have been in presiding over civil matters in the bankruptcy and administrative law fields.

We have handled the case since November of 1989. We have issued both an order on December 14, and minute orders dating from November 8, 1989 regarding this matter. Petitioner had notice in numerous court orders that this judge was handling his case, yet failed to object to our jurisdiction until January 5, 1990. The original conviction was in 1981; no prejudice will result from our handling the case and deciding the petition. We have thoroughly reviewed all filings and transcripts. Under the court's reasoning in *Carter*, we are the sentencing court, and can adjudicate petitioner's motion with all due consideration, fairness, and thoroughness.

### IV.

We have reviewed all: a) case filings; b) proceedings at the time the plea of guilty was entered by defendant on September 25, 1981; and c) proceedings at the sentencing hearing on October 23, 1981. Petitioner falls short of establishing that his conviction resulted in a fundamental miscarriage of justice.

■ Petitioner alleges that he was legally insane when he committed his crimes, and incompetent to stand trial.[4] For the purposes of this *coram nobis* proceeding, the standard of legal insanity is as follows: petitioner must prove that he was so entirely impaired as a result of his mental disease or organic defect that he lacked substantial capacity to appreciate the wrong-

---

**4.** We use the terminology employed by Mr. Ger- ash in his motions before the court.

fulness of his conduct or could not conform his conduct to the requirements of the law. *United States v. Shuckahosee,* 609 F.2d 1351, 1355 n. 4 (10th Cir.1979), *cert. denied,* 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 605 (1980) (referring to the Model Penal Code's definition adopted in *Wion v. United States,* 325 F.2d 420, 430 (10th Cir.1963), *cert. denied,* 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964)).

To prove incompetence to stand trial, petitioner must prove that he was so entirely impaired that he had insufficient ability at the time of his trial to consult with his lawyer with a reasonable degree of rational understanding, and had no degree of rational, as well as factual understanding of the proceedings against him. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *United States v. Newman,* 733 F.2d 1395 (10th Cir.1984); *United States v. Smith,* 521 F.2d 374 (10th Cir.1975).

Petitioner presents testimony that he was insane and incompetent due to undiagnosed neurosarcoidosis, a rare medical malady that causes mental disturbance if untreated with drug therapies such as prednisone. Sarcoidosis is a multi-system granulomatous disorder of unknown etiology characterized histologically by epithelioid tubercles involving various organs or tissues with symptoms dependent on the site and degree of involvement and can manifest its pathologic effect in virtually any organ system of the body including the central nervous system.[5] Neurosarcoidosis, or Mr. Haga's disorder, occurs in about five percent of all cases.[6] Neurosarcoidosis is difficult to diagnose, and is confused with other diseases.

The disease is considered rare, and can develop abruptly. It is marked by lung, lymph node, or liver involvement. Optic nerve dysfunction, chronic meningitis, diabetes, seizures and lesions are also symptomatic. The disease's clinical course is unpredictable. Half of the patients recover spontaneously; chronic phases become active and inactive. Neurological symptoms tend to flare up early in the disease process, then subside and stabilize over time. Later stages show muscular and skeletal development. Finally, neurosarcoidosis is most commonly treated through the use of steroids, such as prednisone. Responses to drug therapy vary greatly, although some, like Haga, exhibit dramatic recoveries.

Mr. Haga exhibits the following symptoms, also common to neurosarcoidosis: seventh nerve and muscular palsy and palate dysfunction or slurred speech, mild hydrocephalus, fatigue, fever, malaise, weight loss and abnormal mental functioning. One distinctive symptom is biopsy evidence of a mononuclear granulomatous inflammatory process, but this is not dispositive of the disease. Mr. Haga's lung biopsy indicates granuloma development.

Petitioner claims that his disease was in an active phase during the time he committed his crimes and at the time of his trial. The active phase of the disease can interfere with organic functioning and cause confusion. Petitioner claims that the disease rendered him insane and incompetent. This conclusion is at best speculative. Upon full consideration of the evidence, we reject petitioner's contention. A review of the testimony highlights our point:

> MR. GERASH: All right. Now as a result of this organic condition, has any other doctor disputed this?

> DR. FREY: No. The reports that I have seen from Dr. Murray, Dr. Bell, and certainly Dr. Rhodes' involvement with the case have all indicated that this is a clear diagnosis which goes back to some-

---

5. Transcript, Hearing re: Motion to Reconsider at 6–7, *United States v. Haga,* No. 81–CR–137 (D.Colo., February 9, 1990). Dr. Frey relied on *The Merck Manual* for his definition.

6. The following discussion is condensed from the testimony presented before the court and its own research on neurosarcoidosis, including reference to the following articles and books: Delaney, *Neurologic Manifestations in Sarcoido-* *sis,* 87 Annals of Internal Medicine 336 (September 1977); Weiderholt and Seikert, *Neurological Manifestations of Sarcoidosis,* 15 Hematology 1147 (1965); *Sarcoidosis,* 4 Neurological Clinics: Infectious Diseases of the Central Nervous System 130–33, 239–41 (February 1986); Harrison. *Principles of Internal Medicine* 1445–450 (11th ed. 1987).

time in the seventies when these symptoms first began and indeed there is an electroencephal—I am sorry—a pneumoencephalographic report in the medical records which I saw indicating even in 1981 when Mr. Haga was complaining of seizure activity and the pneumoencephalogram was done, there was evidence of enlarged ventricles of the brain.

THE COURT: Was there a biopsy ever taken?

DR. FREY: No. Brain biopsy; peripheral biopsies, lung biopsies, yes, sir.

MR. GERASH: In other words, he had a sarcoidosis in his lung?

DR. FREY: Some of the tissue mass was in the lung, yes, sir.

MR. GERASH: Do you have an opinion whether this condition existed in 1979, 1980 when these crimes took place?

DR. FREY: By history and also by data such as the evidence of the enlarged ventricle in that period, I will say yes, that the course of the disease began during somewhere during that time frame.

MR. GERASH: And you concur with Dr. Murray who in his affidavit says that it did exist at that time?

DR. FREY: I do concur.

MR. GERASH: All right. Now do you have an opinion with reasonable psychiatric probability that whether or not Mr. Haga could as a result of this mental disease and defect or mental disease and organic defect, whether or not he lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law?

DR. FREY: I do.

MR. GERASH: And what is that?

DR. FREY: My opinion is that in the context of the disease in question, which appears quite strongly to have been active during that phase, that he would have been so impaired.

MR. GERASH: And this is in '79 and '80?

DR. FREY: Yes, sir.

MR. GERASH: And '81?

DR. FREY: Yes, sir.

On cross examination:

MR. STEPHENS: All right. Did you have the benefit of any medical records that may have been created prior to 1987?

DR. FREY: I do not recall what I had at that time, no, sir.

MR. STEPHENS: All right. You indicated—

DR. FREY: As I said, Dr. Rhodes had accumulated medical records, and he shared with me what he has. At this moment I don't recall everything he had in his packet.

MR. STEPHENS: Do you know whether or not there are any medical records that exist concerning the matters that you testified to which were created prior to 1987?

DR. FREY: Well, I do know that Mr. Haga was treated in the medical facility at Fort Worth, and it then was sent to the Federal Medical facility in Springfield as I recall, and my understanding was that significant medical records were generated from there, and I would look forward greatly to seeing those.

. . . .

MR. STEPHENS: So we really don't know whether he was in an active phase of this abnormal psychiatric functioning or an inactive phase during 1979, '80 and '81, do we?

DR. FREY: No.

MR. STEPHENS: We don't know?

DR. FREY: That's correct, other than the course of the illness is such that it ebbs and flows and works that way.

Transcript of Hearing on Motion for Reconsideration at 8–9, 12, 20, *United States v. Haga*, No. 81–CR–137 (D.Colo. February 9, 1990).

The court is troubled with the lack of medical evidence Dr. Frey used drawing his conclusions about a period of time over ten years ago. Petitioner makes no attempt to trace the organic nature of any particular phases of his disease. Regardless of whether petitioner suffers or suffered from neurosarcoidosis, we are not persuaded that Mr. Haga's disease was so severe at the time that he was legally

insane when committing the crimes and incompetent when entering his plea.

At the time of his conviction, petitioner worked in a law office; at least two competent counsel worked closely and directly with him, and neither lodged any doubt with the court of petitioner's competency to plead guilty.[7] Furthermore, Mr. Haga appeared before Judge Kane, who could fully appreciate petitioner's competency at the time of receiving Mr. Haga's plea and at his sentencing. On neither occasion does the record reflect any irregularities in petitioner's conduct or appearance before the court that would raise doubts as to his competency.

Petitioner has made no attempt to show why due diligence would not have revealed evidence of Mr. Haga's neurosarcoidosis prior to now. Indeed, the record contains evidence that Mr. Haga responded to prednisone therapy while incarcerated. Petitioner uses this medical fact to establish that he suffered from the disease during the relevant period of time. Nevertheless, petitioner does not explain why medical experts who treated him at the time failed to link Mr. Haga's response to prednisone therapy with neurosarcoidosis. Neurosarcoidosis was not a unknown disease at the time. Petitioner's evidence does not discuss this diagnosis—in fact, petitioner makes no attempt to explain why his condition could be none other than neurosarcoidosis. In this case, where evidence indicates that another separate and potentially viable diagnosis could exist, the lack of such an inquiry leaves Mr. Haga's petition flawed.

Finally, the court must balance all evidence in favor of Mr. Haga's petition against the interests of finality in the adjudicatory process. The record indicates that Mr. Haga had fair and full legal representation and judicial consideration of his case at every stage.[8] We see no cause for reconsideration of this matter. This order includes our findings of fact and conclusions of law. Fed.R.Civ.P. 52.

## ORDER

ACCORDINGLY, it is hereby ORDERED:

That Petitioner's Motion to Reconsider and Vacate Order re: *Coram Nobis* is DENIED: The motion to vacate order and assign to Judge Kane is DENIED and the motion to reconsider is DENIED. We AFFIRM our order of December 14, 1989.

APPENDIX A

The following statements made by defendant Haga at his change of plea hearing indicate his competency to plead guilty on September 25, 1981:

THE COURT: Have you taken any medicine or any kind of drugs or liquors or intoxicants which would affect your judgment this morning?

MR. HAGA: No, sir.

THE COURT: I understand that you are 29 years of age and that you have gone to graduate school.

MR. HAGA: Yes, sir.

THE COURT: Did you have difficulty, functional or otherwise, in reading or understanding the English language?

MR. HAGA: No, sir.

THE COURT: There is a statement entitled "Statement by Defendant in Advance of Plea of Guilty" which states the possible penalties involved, and it states the various rights which you are waiving. It includes a notice that there will be no appeal of you plead guilty, and it further states what the agreement is that you've entered into with the government. On page 3 thereof on the line for the defendant is a signature which I read to be Michael W. Haga. Is that your signature?

MR. HAGA: Yes, sir.

THE COURT: Beneath that is the signature of Mr. Wild. He certifies that he's discussed this statement with you

---

7. See Appendix A for excerpts of relevant testimony.

8. A review of the file indicates a thorough advisement of legal rights by Judge Kane at the time of entry of plea by defendant on September 25, 1981 and at his sentencing on October 23, 1981. See Appendix A for excerpts from the transcripts of both his plea and sentencing.

and he believes you understand it in its entirety and that you are knowingly and voluntarily entering this plea. Do you agree with that statement?

MR. HAGA: Yes, sir.

THE COURT: And is there any mental reservation you have at all about entering this plea of guilty?

MR. HAGA: No, sir.

THE COURT: Are you doing so because you are in fact guilty?

MR. HAGA: Yes, sir.

THE COURT: The court is satisfied that the defendant understands the nature and consequences of the act of pleading guilty and that he understands the possible penalty involved. The court further understands that there is a factual basis and so finds a factual basis to support this plea of guilty, that the defendant freely and voluntarily enters the plea of guilty based on full knowledge of the rights which he is waiving.

Transcript, Change of Plea at 6–8, *United States v. Haga*, No. 81–CR–137 (D.Colo., September 25, 1981).

The following statements made by defendant Haga and his attorney at his sentencing indicate his competency to plead guilty on October 21, 1981:

MR. WIGGINS: As you may know, Mr. Haga has been working for my office since he was released—or shortly after his release from jail. That is because he is educated to do the kind of work that we do and because I needed a law clerk. Mr. Haga has worked as one of the best law clerks I have ever had. He has excellent writing ability and excellent research ability. Why he never practiced law after receiving his degree is a mystery to me. Why he never got a license is a mystery to me. More than that, this offense is a mystery to me.

. . . .

THE COURT: Mr. Haga, do you have anything to say?

MR. HAGA: Yes, sir. I don't really know where to begin, except I wished it never happened. I guess I—like anybody, you get trapped and you try and protect yourself. But I think my under-

lying thing throughout all this was I always wanted to make the bank whole, and I still do. It will never happen again.

About me, I know that society says that you need to be penalized for what you have done, and I can understand that. For me, I think the real punishment was caring for people that I worked with and wondering or maybe knowing that I would let them down. And when I realized that I would, I think that's the reason that I did a few of the things that I did. I can face that now.

I don't blame anybody for what happened except myself. I allowed myself to get into something that I'm not exactly sure why I did, and I just wished it had never happened. I do want to repay the bank. That's always been my intention. It will be in the future.

Transcript, Sentencing at 4, 8, *United States v. Haga*, No. 81–CR–137 (D.Colo., October 23, 1981).