**UNITED STATES of America,**
**Respondent-Appellee,**

v.

**James Vincent KEOGH, Petitioner-**
**Appellant.**

**No. 480, Docket 35360.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 17, 1971.

Decided March 12, 1971.

738

Philip Handelman, New York City (Robert M. Trien, New York City, of counsel), for petitioner-appellant.

William T. Murphy, Atty., Dept. of Justice, Brooklyn, N. Y. (Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, New York City and Mervyn Hamburg, Atty., Dept. of Justice, Washington, D. C., of counsel), for respondent-appellee.

Before WATERMAN and FRIENDLY, Circuit Judges, and McLEAN, District Judge.*

FRIENDLY, Circuit Judge:

This proceeding begins where our last opinion in this case ends, United States v. Keogh, 417 F.2d 885, 888–890 (2 Cir. 1969).[1] Discovery incident to the hearing of the portion of Justice Keogh's first *coram nobis* petition, which concerned four bank deposits made by Dr. Erdman close in time to the alleged receipt of the bribe money by him, revealed the existence of an FBI report dated February 26, 1962. Another admittedly less significant FBI report dated January 24, 1962 had been made available to the petitioner in the course of his disbarment hearings. These re-

---

* Of the District Court for the Southern District of New York, sitting by designation.

1. We shall assume familiarity with that opinion and also with our earlier opinions affirming Justice Keogh's conviction, United States v. Kahaner, 317 F.2d 459 (2 Cir.), cert. denied, Corallo v. United States, 375 U.S. 835, 836, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963), and directing a hearing on one aspect of his first coram nobis petition, 2 Cir., 391 F.2d 138 (1968).

ports related to a $50,000 investment in the Ace Manufacturing Company, a Glen Burnie, Md., concern, in late April, 1961, by Sanford Moore, whose indictment for bankruptcy fraud had triggered the alleged conspiracy to obstruct justice, Louis Forman, who was claimed to have furnished Moore with most of the bribe money earlier in 1961, and Dr. Erdman, who allegedly received the bribe money from Moore and paid it to Keogh and Kahaner. It had been developed at the trial that Moore and Forman had a two-thirds and Erdman a one-third share in this investment. The report revealed that the contribution of Moore and Forman was paid by a check in Forman's name for $33,332.66; that it was dated April 28, 1961, and was drawn on the Meadow Brook National Bank; that the account on which it was drawn was opened only on May 2, with a deposit of $100; that the check was received for payment on May 4; that the overdraft was met by a cash deposit of $33,350 on May 5; and that this deposit consisted of $19,700 in $100 bills, $9850 in $50 bills, $1800 in $20 bills, and $2000 in $10 bills. The claimed significance of this was that the bribe money allegedly paid by Moore to Erdman and transmitted to Keogh and Kahaner was made up of bills of rather similar denomination and that the deposit coincided in time with representations by Forman to Erdman that the latter should return the money to Moore "because he didn't deliver what he was supposed to." Hence, it was argued that "the evidence that Forman had $33,350 in small bills on May 5 would have materially strengthened Keogh's claim that Erdman had never given him any of the bribe money." 417 F.2d at 889. On the previous appeal from denial of the first *coram nobis* petition, we declined to consider this since it was not within the scope of the hearing we had directed and had "not been explored in depth"; rather we affirmed "without prejudice to Justice Keogh's filing a new petition" for *coram*

*nobis* on this and certain other matters, 417 F.2d at 889.

The further proceedings took a course quite different from what we had envisioned. Although we had not directed an evidentiary hearing in so many words, our opinion rather clearly contemplated one. Instead of the simple petition which was all that would have been needed to obtain this, Keogh filed an elaborate one, dated December 24, 1969, which was supplemented by a long affidavit, in the nature of a legal argument, by the counsel who has represented him in these *coram nobis* proceedings. The Government's initial response, late in January 1970, was that these papers "raise in minute detail numerous issues of fact and law which in our opinion require extensive preliminary investigation and a full evidentiary hearing in order to provide the Court with sufficient facts to decide the questions." It was given until May 4 to file a response. The Government then sought and obtained an additional extension to June 1, representing that extensive factual inquiry not only into the record "but also into extrinsic matters which happened or allegedly happened eight or nine years ago" had "disclosed evidence substantially negating petitioner's claim of materiality."[2] Instead of submitting such evidence, it moved on the appointed day to dismiss the petition on the ground that Keogh had failed to support it "with affidavits of fact based on personal knowledge which, if they were true, would merit issuance of the Writ." This motion was accompanied by an affidavit in the nature of argument by an attorney in the Criminal Division of the Department of Justice which advanced no new facts, and two short affidavits of the prosecutors, Hundley and Lally. Hundley said that although he had no specific recollection of having seen the FBI report of February 26, 1962, during his trial preparation, he "probably had knowledge of the basic information contained in that report." He added, irrele-

---

2. Among the information awaited by the Government was data expected from a London bank.

vantly and almost certainly incorrectly, that "[d]efense counsel has had access to this report since I voluntarily turned over all the material related to" the Keogh matter to Hon. Bruce Bromley, the referee in the long pending Keogh disbarment proceedings. See Keogh v. Richardson, 17 N.Y.2d 479, 266 N.Y.S.2d 984, 214 N.E.2d 163 (1965). Lally had "no specific recollection" of having seen the February 26, 1962, report. Both prosecutors averred that they "did not in any way conceal or attempt to conceal or suppress in any manner that report or any information to which defense counsel might have been entitled." Petitioner's counsel submitted a reply affidavit, in the nature of argument. Since the Government had suggested there was no proof that the reports had not in fact been turned over, petitioner also filed an affidavit of his trial counsel, Henry G. Singer. Mr. Singer stated his best recollection was that he had not seen them; to support this he alleged that every such report turned over to him during the trial had been marked for identification and that review of the clerk's minutes in which the trial exhibits were listed showed that the two reports were not among them. Excerpts from the disbarment testimony were also attached.

With the equivalent of some 200 pages of printed matter having been thus accumulated, the Government's motion to dismiss came on for argument. It was agreed that petitioner's counsel should be heard first. He began by saying

> Your Honor, the writ in this case should issue and I would normally be beseeching your Honor for a hearing, but in view of the papers submitted by the Government it appears not only, perhaps, that I didn't need any answering papers, as was indicated to me, but certainly there is no necessity for a hearing because they raise no arguable or justiciable issue.

Since Government counsel were now in accord about the absence of need for an evidentiary hearing, Judge Weinfeld announced at the close of the argument that he would decide "upon the papers as submitted by counsel." There was no demur. In his opinion dismissing the petition he stated that the merits would "be decided upon the moving papers, the files, and the trial and hearing records of the case without regard to any new matter presented in the government's answering affidavits"—of which, indeed, there was precious little. Since we can add nothing to Part I of his decision, in which he rejected claims based on evidence of certain financial dealings of Mrs. Erdman which had come to light during the hearings on the first *coram nobis* petition, we shall limit this opinion to the more serious questions raised by Part II, relating to the FBI reports of February 26 and January 24, 1962.

Preliminarily, we must confess some regret that an evidentiary hearing was not held. While it is understandable that the Government might not have been able in 1970 to demonstrate that there was an innocent source for the $33,350 cash deposit of May 5, 1961, with the degree of certainty it had established two years earlier as regards Erdman's bank deposits of February 1961, see 417 F.2d at 887, and thereby have put the entire matter to rest, we would have been better satisfied with a record that contained oral testimony. Hundley, Lally, Singer, and other trial attorneys were surely available. So also were Moore, who has given evidence on this very matter in the disbarment proceedings, and Erdman. While Forman had refused to discuss the matter under advice of counsel, this does not mean that, if subpoenaed, he would necessarily have advanced a claim of privilege or could have sustained one.[3] However, we see no basis on which we could properly reverse the district judge and order still

---

3. Forman was named in the indictment as a co-conspirator but not as a defendant, and the statute of limitations both on the obstruction of justice charge and on any claim of perjury at the trial has long since run. See 8 Wigmore, Evidence (McNaughton rev. 1961), § 2279(c) at 482.

further proceedings in this case because of his not directing a hearing which was not sought either by petitioner's counsel, quite possibly for strategic reasons, or by the Government, unless we were convinced by examination of the record that the interests of justice so required. We are not.

The district court, 316 F.Supp. 921, rested its denial of the petition on two grounds: (1) that "it has not been adequately established that in fact these reports [of January 24 and February 26, 1962] were not turned over and available to the defense at or before the trial," and (2) that in any event the proof did not meet the standards for issuance of the writ laid down in United States v. Keogh, *supra*, 391 F.2d at 146–148.

In support of the first ground, the judge noted what he called the "guarded affidavit" of Mr. Singer, which said only it was his "best recollection" that he had never seen the report of February 26, 1962. In addition, the court cited examples of material turned over to the defense which had not been listed in the clerk's minutes or had not been marked for identification, and pointed to petitioner's failure to submit supporting affidavits by Mr. Singer's associates[4] or other trial attorneys.[5] Conceding some force in these points, we think them insufficient to support the conclusion. Singer's affidavit was enough to put on the Government the burden of coming forward with proof that the reports had been furnished. It came forward with nothing except Hundley's affidavit which, by urging, apparently in error, that the February 1962 report had been turned over to Referee Bromley, inferentially admitted that it had not been disclosed at an earlier date. We will therefore assume that the defense did not have the February 1962 report until this was unearthed by discovery in the first *coram nobis* proceeding or the January 1962 report until it was produced during the disbarment hearings.

In United States v. Keogh, *supra*, 391 F.2d at 146–148, we outlined three categories of cases relating to prosecutorial non-disclosure:

(1) "[W]here the prosecutor's suppression is 'deliberate,' by which we include not merely a considered decision to suppress, taken for the very purpose of obstructing, but also a failure to disclose evidence whose high value to the defense could not have escaped the prosecutor's attention";

(2) Where the prosecution fails to furnish evidence favorable to the accused upon request; and

(3) "[W]here the suppression was not deliberate in either of the senses we have included and no request was made, but where hindsight discloses that the defense could have put the evidence to not insignificant use."

We held that issuance of habeas corpus for cases in the third category required "a substantially higher probability that disclosure of the evidence to the defense would have altered the result." We also held that the standards in *coram nobis* were higher still. This was because the only consequences still being inflicted, namely, civil disabilities and moral stigma, while serious in any case and especially so to a former New York Supreme Court justice, were considerably less severe than continued imprisonment, and the unlikelihood of retrial would render issuance of the writ the practical equivalent of an acquittal. Hence, we said, with respect to the third category, that

it is only when the court concludes that the undisclosed evidence would have permitted the defendant so to present his case that he would probably have raised a reasonable doubt as to his guilt in the mind of a conscientious juror that justice compels the invalidation of the conviction.

---

4. Mr. Singer had been assisted at the trial by John P. McGrath and C. Joseph Hallinan.

5. Kahaner was represented by William W. Kleinman, now deceased, and Eugene Gold, Corallo by Michael P. Direnzo.

391 F.2d at 148. Petitioner's claim here is, in effect, that his case comes within the second branch of (1) or, failing that, under (3).

Petitioner suggested below that the FBI investigation of the financing of the Ace investment was triggered by Moore's last appearance before the grand jury on October 24, 1961. The prosecutor then asked what Moore had meant by having answered to one of the grand jurors that Dr. Erdman was "a mystery man." Moore's reply was that Erdman sometimes seemed "magnanimous" and sometimes "hungry and avaricious." Amplifying the latter, he said that Erdman had "been lending Gabe [Forman] money trying to get control" of Ace and that as to "the whole transaction, the $35,000, I can't actually pin it on him and I don't want to say he has any of the money but—there has been a few occasions, I can't recall off-hand, that gave me that impression." Moore was also asked, "Do you think the Doctor kept some of the money?," and responded, "I don't know. I don't want to say because it would only be an assumption. I really don't know.  *  *  *"
Earlier, on July 17, 1961, Forman had testified before the grand jury concerning his May 4 meeting with Dr. Erdman at Ace:

> I sat down with Dr. Erdman and I told him, I said the most important thing now is this money that he took and he didn't go through with the deal, and he should return the money, and I felt that he took the money
> *  *  *
>
> I told him that I'd like him to return the money. He said, well, he didn't have all the money available now, that he would give me five thousand dollars and a note for thirty thousand dollars.

A July, 5, 1961 statement given by Moore to the FBI stated:

> FORMAN advised me that he inquired of ERDMAN as to the disposition of the original $35,000 in cash, and he, ERDMAN, stated that the money had been given to different people, and that he, ERDMAN, could account to GABE for the disposition of the $35,000. ERDMAN is said to have added that if he did account for the $35,000, he, FORMAN, would have to apologize. Since that occasion, FORMAN has been in contact with ERDMAN on several occasions at which time ERDMAN continues to make the representation that he would account for the disposition of the original $35,000, but as yet has not done so.[6]

And a memorandum dated November 22, 1961 from Hundley to Attorney General Robert Kennedy stated, in discussing whether Keogh should be prosecuted as well as Kahaner:

> Erdman is an enigma and on cross-examination will be vulnerable because of his extra-professional interests in a slot machine company, psychiatric treatment and his penchant for fixing cases for "kicks." Unless, however, we are able to establish that Erdman kept the pay-off money which we cannot at this time it will be most difficult to try the case without Keogh as a defendant. It's all pretty much the same ball of wax; the facts against Keogh would come out at any trial and it would certainly complicate matters to try and convince a jury that Erdman was telling the truth about Kahaner and not Keogh.

It is against this background that we must endeavor to place ourselves in the position of the prosecutor when he received the FBI reports of January 24 and February 26, 1962, these being respectively of 30 and 12 typewritten pages. On their face they showed that Erdman had paid for his one-third share of Ace with three checks. Two of them, a personal check for $6,917 and a check of Jerome Edelman, a lawyer for $6,000 —allegedly a loan, had been delivered on April 28, 1961 to Becker, the lawyer for

---

6. Forman's grand jury testimony and Moore's statement were made available to the defense at trial.

the investors; the third was a personal check dated April 14 for $3,750 that had been issued directly to Ace.[7] They also revealed that Forman had paid for his own and Moore's share with a check on his newly opened account at the Meadow Brook National Bank, made good in the peculiar manner we have stated, and that Forman had been advised by his attorney not to discuss the matter with the FBI. With the advantage of hindsight, one might jump to the conclusion that Hundley should have realized that this information could have given some support to a defense theory that Erdman had kept the bribe money until forced to return it in May, and that he was therefore guilty of "deliberate suppression." But such a judgment would be altogether too severe. While the material we have summarized indicates that Hundley did anticipate a defense theory that Erdman kept some or all of the bribe money, a report showing that Erdman had paid for his share of the Ace investment by checks, two his own and the third a loan from Edelman, had no substantial tendency to establish this. Indeed, as counsel for petitioner concedes, "[t]he FBI report indicates that the questionable funds were put up by Moore and Forman,

not Erdman." At the time he received the FBI reports, Hundley had no reason to anticipate that the defense would suggest that rather than keeping the money for his own benefit, Erdman had returned most of it to Moore and Forman. The pre-trial statements indicated at most that Moore and Forman had some question in their minds whether Erdman had kept the money; they would have had no such question if Erdman had returned it to them. To hold that at this stage Hundley should have anticipated every conceivable defense strategy that could have been constructed from a few scattered remarks in a voluminous pre-trial record would be to shut our eyes to the realities of pre-trial preparation. We thus cannot fault Hundley for failing to turn over the reports before the trial began, since they gave little support to the defense theory noted above and the prosecution cannot be held responsible for not anticipating the one now suggested.

The focus then shifts to the trial itself. Kahaner's counsel cross-examined Moore with respect to his and Forman's investment in Ace; we set this forth in the margin.[8] Further cross-examination

7. At the trial Erdman offered to counsel for Kahaner to produce the checks covering his investment in the Ace transaction but the offer was not accepted.

8. Q. In what form did you make the investment; was it by check or cash? A. We gave them a check for thirty—
Q. Wait a minute. You gave a check, you say? A. Yes.
Q. Whose check did you give the Ace Company? A. I believe Mr. Forman wrote his own check.
Q. Whose check did you give the Ace Company? Forman's check or your own check? A. I don't recall.
Q. Did you have any checking account at the time you made the investment? A. I don't believe my check—
Q. Did you have any checking account at the time you made the investment in Ace? A. I had this All-Type—
Q. Please answer my question. Did you have a checking account, Sandy Moore, Sanford Moore? A. No, I didn't have one. If I had, there wasn't any money in it.

Q. You were having this bankruptcy difficulty? A. I had judgments on my name.
Q. Judgments against you? A. That's right.
Q. But certainly this other company that succeeded Gibraltor, that had no $17,000 in its account, did it? A. No, sir.
Q. So that you put up no money that could be traceable to you or no check that could be traceable to you in this business venture in the purchasing of an interest in the Ace Company of Maryland; is that correct? A. I got the money from the bank.
Q. You got the money from the bank? A. Yes, sir.
Q. What bank? A. Meadowbrook National Bank in Woodmere.
Q. Who made the application for the loan? A. It wasn't a loan. Mr. Forman sent the money from England.
Q. I didn't ask you that Mr. Moore. Mr. Forman put up the money for you; is that what you are telling us? A. He sent back my money, yes.

of Moore by Keogh's counsel on this subject added nothing as to the source of the funds for the Ace investment, although it rather clearly demonstrated counsel's awareness of the $34,000 check to Ace. Forman testified, on direct examination, that at a meeting around that time in Baltimore, he told Dr. Erdman that he "wanted the money back for Sandy [Moore] that we gave him because he [Erdman] didn't deliver what he was supposed to"; that Erdman agreed to return the money but said he could do no better at that time than give $5000 in cash and a $30,000 note; and that on Forman's expressing dissatisfaction Erdman sought more time and promised to "work it out." Forman went on to testify that on one occasion when he sought the return of the money, Erdman said that "he had given most of the money to the judge and gave some of it to Kahaner" and that he was going to seek further help from the judge. In his lengthy cross-examination of Forman, Keogh's counsel, rather than pursuing Forman's direct testimony in an effort to show that he had secured reimbursement of the bribe money, pressed him hard in a not ineffective endeavor to show that Forman had charged Erdman with having kept the $35,000 and therefore was morally bound to indorse the $50,000 of notes given by Moore in the "restitution" phase of the conspiracy, see 317 F.2d at 466–467, 476–477; we quote the relevant cross-examination in the margin.[9] This was

Q. Did Mr. Forman send you, Sanford Moore, money? A. That's right.
Q. And he sent it through the bank? A. Yes, sir.
Q. Did you receive any sort of evidence of the fact that the money was there in your name? A. Yes, sir.
Q. What did you get? A. I got a bank check from the bank.
Q. From the bank? A. From a bank in England to the bank, the Meadowbrook, in my name, and I cashed it immediately so that no creditor could take it.
Q. Precisely. That is precisely the point, Mr. Moore. A. Yes.
Q. The investment, however, with the Ace Company was made in Forman's name for himself and you; is that right? A. That's correct.
Q. In other words, your name doesn't appear as being one of the owners of the Ace Company? A. No, sir.
Q. So that the check that you got from Forman, you used in Forman's name; is that right? A. That's correct.
Q. How much was the investment of yours and Forman's whichever way you want to look at it? A. $17,000 each, $34,000.
Q. How much of an interest in Ace did you get for this $34,000? A. We had, Forman and myself, two-thirds of one-half of the corporation.

9. Q. Actually, you told Erdman he was a liar, didn't you? A. Yes.
Q. Didn't you? A. Yes, in discussion.
Q. You told him he was a crook and a cheat, cheated Moore out of $35,000.

A. Yes, at one time I did. I had a discussion.
Q. That's right. And you told him in plain and simple words you thought that $35,000 ought to come back? A. Yes, that's right.
Q. To Moore? A. That's right.
Q. Is that right? A. That's right.
Q. And Erdman said, "I will give you $5,000 in cash or a check and a note for $30,000"? A. Right.
Q. Is that right? A. That's right.
Q. And it was that $35,000 that you were insisting he endorse the notes for the $50,000 for the so-called restitution; isn't that right? A. Yes, sir.
Q. And that is the same thing, wasn't it? A. Right.
Q. In other words, Erdman, having stolen the money from Moore, you insisted that he endorse these notes?
Mr. Hundley: I object to that question.
The Court: Objection sustained.
Q. If I say that is what you told Erdman, didn't you, isn't that correct? A. I thought he had taken the money.
Q. Since he took the money from him—
Mr. Hundley: Let him finish.
Q. Have I stopped you from finishing? A. I told him I wanted that money back.
Q. That he was making good the $35,000 by endorsing the notes; isn't that right, this restitution? A. It could be.
Q. As a matter of fact, the last time you were asked a question that I can find, didn't you say on July 6th in words or substance that you had been in constant communication with Erdman

valuable testimony since it linked with the defense's most telling pieces of evidence to support its theory that Erdman had kept the bribe money, to wit, the testimony of a bankruptcy trustee of Moore's company concerning a statement by Erdman "that he had security of $35,000" for the $50,000 of notes he had indorsed and Erdman's letter of July 13, 1961, to the same effect. See 317 F.2d at 476–77.

With the defense having taken this tack and also have eschewed such obvious questions of Moore and Forman as on what bank was the check to Ace drawn, what was the amount of the bank check from England, and when was it sent, see also fn. 9, *supra,* we find it impossible to conclude that the "high value" of the February 26, 1962 report "to the defense could not have escaped the prosecutor's attention," 391 F.2d at 147, particularly since there is no evidence the prosecutors had looked at it in the intervening three months. As we said in that opinion, *id.*:

> Any lawyer who has prepared and conducted a trial like this one, lasting 23 trial days, knows how easy it is to forget items in his files that an unexpected turn in the evidence has made helpful to his own case, let alone those that might aid his opponents—some-

up to July 6th and you were never able to get from him a satisfactory explanation of what he had done with that $35,000; is that right? A. That's right.

Q. And it is true today, isn't it, right up to now? Isn't that so? A. Right.
He also questioned Forman about the Ace investment; his suggestion that the bribe moneys sent over from England had found their way into Ace through the investment was met by a flat denial:

Q. Isn't that where the $33,500 that went to Ace came from? A. No, that is not where that came from, no.
Instead of continuing this line of inquiry with the rather obvious query "where did the money come from," Singer went on to a different matter. Counsel could well have thought it better to leave matters as they stood, rather than risk an unequivocal response concerning the precise source of the funds.

thing which, under our adversary system, is not exactly in the forefront of his mind.

If petitioner is to prevail, he must therefore bring his case within the third category, 391 F.2d at 147, "where the suppression was not deliberate in either of the senses we have included and no request was made, but where hindsight discloses that the defense could have put the evidence to not insignificant use," with the attendant higher standards of materiality, particularly in *coram nobis.* Despite some surface plausibility in the contention that the defense would have been materially aided by knowledge that Moore and Forman had $33,500 in bills ranging from $100 to $10 in May, 1961, analysis convinces us that Judge Weinfeld was correct in concluding that this would not have created a reasonable doubt of petitioner's guilt in the mind of a juror who was otherwise satisfied— even if we assume the applicable test in *coram nobis* to be no higher than that, see 391 F.2d at 148.

In the first place, any suggestion by the defense that the cash deposits of May 5, 1961, represented a return of the bribe money would have met with vigorous denial on the part of the only three persons having knowledge of the facts —Erdman, Forman and Moore.[10] For-

10. Keogh's counsel has asked us to consider testimony on the subject given by Moore in the disbarment proceedings in December 1970. While we could hardly do this for purposes of reversing the district court, which had no opportunity to hear this, we will honor counsel's request since, in our view, the net effect of the material is to sustain the district judge. Moore testified that in late April 1961, he went down to Glen Burnie, Maryland, to complete the Ace deal, and then signed a check for $33,332.66 drawn on the Meadow Brook National Bank using Forman's name, since he had received assurances from Forman that the latter was flying home from London and would bring the money to meet the check. On May 5, after Forman's return from England, Moore and Forman went to the Meadow Brook National Bank to make a cash deposit to cover the check; the deposit of $33,500 consisted of $20,000 which Forman had with him and of $13,350 which

man's testimony that he continued to question Erdman about the money after May 5 and that up to July 6 and indeed "right up to now" (at the trial) Forman was never able to get a satisfactory explanation of what Erdman had done with the money would have been particularly hard to overcome. But even if the jury had chosen to disbelieve all three witnesses and infer that nevertheless the $33,500 came from Erdman, it is by no means clear that this would have worked in Keogh's favor. In view of Forman's testimony that on the very day before the deposit, Erdman had said he could do no better than pay $5,000 in cash and deliver a $30,000 note and had remarked on one occasion about seeking help from the judge, if the jury had accepted that the immediate source of the $33,500 in bills was Erdman, it might well have inferred also that the ultimate source of the bulk of the money could have been Keogh. This would have been damaging in the last degree since, among other things, it would have destroyed the defense's strong reliance on the Government's inability to trace what Keogh or Kahaner had done with the money allegedly received. Moreover, in an attempt to attain a goal so difficult to reach and thus so fraught with danger if achieved, a successful effort to develop that the $33,500 represented a return of the bribe money would have impaired the defense's most solid argument for the theory that Erdman had always kept this. If Erdman had returned the bribe money, what reason would there have been for him to indorse Moore's dubious $50,000 notes to the trustee in bankruptcy?[11] And how, on the hy-

---

Moore obtained by cashing a check (or perhaps several) on one (or perhaps several) of his corporate accounts at the same bank; the source of this was a bank check which Forman had sent to Moore a few weeks before; Moore was never physically handed the $13,350 in cash. After being confronted with the excerpts of his trial testimony quoted above, he denied there was any inconsistency. When shown a statement of Forman at trial to the effect that Forman had not brought any money back with him from England, Moore claimed that the cash Forman brought to the bank came from one of Forman's American accounts to which he had been sending money from England. He was also confronted with an affidavit prepared for the Internal Revenue Service in 1965, in which he said:

At the end of April 1961, Forman opened a checking account by mail at the Meadowbrook National Bank and I deposited $33,350.00 into this account on May 5, 1961. The deposit slip shows that this amount was in currency. Actually, immediately before this deposit, I cashed at the same bank two checks issued by Machinery Imports, Ltd. payable to me and drawn on an English bank. These checks totalled approximately $20,000.00. These checks represented the return to me of funds I had invested in Machinery Imports, Ltd. I added $1,350.00 in currency which I had withdrawn from the Charcoal Pit Restaurant which I then owned. Forman loaned me $12,000.00 in currency which

he had personally borrowed from the attorney for Mills Bell-O-Matic.

Moore claimed that he now was not sure whether Forman had brought $20,000 in cash or whether the $20,000 derived from checks issued by Machinery Imports, Ltd.

So maybe he didn't have it in his pocket bulging out. I don't know. I can't recall whether the bank cashed the bank check or he gave me cash, but I know he put in twenty thousand. And the twelve thousand we had gotten back from New York from an attorney who handled the Mills Bell-O-Matic franchise which I had forgotten about * *. I can't remember everything.

While we agree with counsel that Moore's various versions are not wholly consistent, that is not too surprising after the lapse of nine years and it would be a long jump to infer from any of them that the true source of the $33,500 was Erdman.

11. Petitioner endeavors to answer this by contending that "if the payment to Forman were anything else than unconditional, i. e., if it was a loan as Moore had at one time testified, then the pressure would still have been on Erdman to do something else for Moore, such as signing the restitution notes as guarantor." For the jury to accept this would have required them not only to reject Forman's testimony that he never could ascertain what Erdman had done with the bribe money but to believe that, after insisting on its return because of Erdman's nonperformance, Forman had agreed to receive it merely as a loan to Moore.

pothesis of a return, could the defense have made the effective use it did of Erdman's oral and written statements to the trustee that he had security of $35,000? To ask the jury to believe that, despite all the contrary evidence, Forman had forced Erdman *both* to repay $33,500, *and* to indorse $50,000 in notes, with some arrangement whereby Forman and Moore would indemnify him to the extent of $35,000, particularly with the risk we have noted of attribution of a large part of the $33,500 to Keogh, would have been a far less effective tactic than the one followed in Mr. Singer's cross-examination of Forman, see n. 9, and in the summation. This was that it was because Erdman had *kept* the money that Moore and Forman were able to press him into indorsing the $50,000 of notes.[12] With the defense having made this wise tactical choice [13] and having failed to propound questions of Moore and Forman about the Ace investment that obviously must have occurred to such "diligent defenders," see United States v. Soblen, 301 F.2d 236, 242 (2 Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962), as counsel for Keogh and Kahaner, we see no sufficient basis for invalidating the conviction because of failure to turn over the February 26 or January 24 reports.

The only other point raised in regard to the FBI reports that is worth noting is the claim that disclosure that Forman appeared to have written a check dated April 28, 1961, would have weakened the Government's evidence that, as shown by his passport and other proof, he did not return to this country from England until April 30, and would thereby have repelled the attack on Keogh's testimony that Forman had accompanied Erdman and Moore on their visit to his chambers on March 29. Quite apart from possible predating of the check, this, as Judge Weinfeld observed, is "a giant leap backward." Moreover, we now know from Moore's testimony in the disbarment proceeding, see fn. 10, that the riposte to any argument based on the date of the check would have been that Moore signed Forman's name on the April 28 check in anticipation of Forman's early arrival.

■ When all is said and done, the case in essence stands no differently than when we sustained Keogh's conviction, after heavy attack, eight years ago. See 317 F.2d at 485. If the jury believed Moore and Erdman, the Government's proof was overwhelming; if they did not and accepted Keogh's and Kahaner's denials, they would have acquitted. Had the Government failed to turn over evidence it had reason to know would discredit either of its two chief witnesses in a significant way, relief should indeed be granted. On its face the February 26 report had no such effect. Rather it confirmed Moore's testimony on cross-examination that his and Forman's Ace investment had been paid by a check covered by a cash deposit and dispelled the suggestion that Erdman had used part of the cash Moore had delivered to pay for his share. It is asking too much of the prosecution to anticipate a theory of defense that the cash constituted a repayment of the bribe money by Erd-

12. We are not suggesting that counsel is under any obligation to urge only consistent theories of defense. Within the limits permitted by the evidence or any rational inferences therefrom, counsel is free to take any tack, however inconsistent it may be with his other lines of defense, which he thinks may raise a reasonable doubt of the defendant's guilt. On the other hand, in endeavoring to determine after the event whether evidence could have been put "to not insignificant use," a court cannot assume that counsel would deliberately have undercut a stronger theory of defense by pressing a less persuasive and inconsistent one, and certainly cannot expect the prosecution to have anticipated such a course.

13. Doubtless this is what Judge Weinfeld had in mind when he characterized Mr. Singer's affidavit as "being significant for what it does not say." Suggestion that Erdman had returned the money to Moore and Forman would also have been inconsistent with the alternative theory of Keogh's counsel, namely, that the bribe money had never been raised at all. See 317 F.2d at 476.

man, especially when the defense, having been alerted to the possibility of making point by Moore's and Forman's testimony, declined the gambit and adhered to the contrary position—supported by the very testimony of Forman which, on the present theory, the jury would have had to reject, to wit, that he suspected Erdman had kept all or most of the money. Mindful as we are of the earnestness with which petitioner asserts his innocence and the peculiar seriousness of the conviction to him, we are satisfied the time for finality has come. He has had one evidentiary hearing in *coram nobis* and an opportunity for a second, as well as extensive consideration of many other points on which no such hearing was found to be warranted. The disbarment hearing, in which the New York Court of Appeals has afforded him a broad opportunity to relitigate the issue of his guilt, is still open. If he should obtain a favorable result in that proceeding, other methods for attempting to erase his federal conviction will be available to him. Our review of the record convinces us that he would gain nothing by our directing an evidentiary hearing on the instant petition even if we were now to entertain a request for such a hearing not made before the district court.

Affirmed.